UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,             CASE NUMBER 15-cr-20652

-v-                                 HON. GEORGE CARAM STEEH

D-12 JEFFERY ADAMS,

               Defendant.

_____/

**United States' Response Opposing
the Defendant's Motion for Compassionate Release
or Request for Home Confinement**

Jeffery Adams, A.K.A. "Product" or "Brick", is a thirty-one year old, long-standing member of the Seven Mile Bloods [SMB] as far back as 2007. Since then, Adams possessed and distributed narcotics in both Detroit, in the "Red Zone," and in West Virginia, often with other SMB members. Adams also used social media to promote SMB's violence and stoke the gang war between SMB and its rival gangs on the east side of Detroit. Beginning in 2012, Adams used his Facebook account to promote his narcotics sales and extol the violence SMB members committed against rival gang members. Moreover, as the primary author for the Instagram account "OOO_big_blood," between March 24 and May 19, 2015—a time when SMB member co-defendants committed at least three shootings, including a

murder—Adams actively promoted the escalating violence: he identified the rival gang member targets and locations; he "kept score"; and, he bragged and cheered when SMB drew blood. He pleaded guilty to Racketeering Conspiracy and was sentenced to 120 months incarceration in the Bureau of Prisons [BOP].

Adams began serving his current sentence on March 4, 2019. *Gov't Sealed Ex. A, BOP Public Information, 4.* He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

Adams has met his mandatory exhaustion requirement. *United States v. Alam*, 960 F.3d 831 (6th Cir. 2020). However, Adams does not satisfy the substantive requirements for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Even assuming a defendant facing a heightened risk from Covid-19 could demonstrate "extraordinary and compelling reasons" for release, Adams does not have a chronic condition that places him at increased risk for severe complications from Covid-19. His reasons for release are therefore not "extraordinary and compelling." Further, the § 3553(a) factors do not support release because Adams has a long history with a violent narco-street gang from the east side of Detroit. Adams himself has sold drugs both in Detroit and West Virginia as part of the opioid pipeline. In BOP custody, Adams has had five

disciplinary sanctions in four incidents from 2017 to present. *Gov't Sealed Ex. B, BOP Inmate Discipline Data, 2.* Pursuant to the First Step Act, BOP assesses Adams as a medium recidivism risk. *Gov't Sealed Ex. C, Pattern Score First Step Act, 2.*

The Bureau of Prisons has also taken significant steps to protect all inmates, including Adams, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). The Bureau of Prisons has also received 16,750 doses of the Covid-19 vaccine as of January 15, 2021 and is distributing the vaccine to its staff and inmates as quickly as it is received by each institution. CDC Covid-19 Vaccine Tracker. The Bureau of Prisons also continues to assess its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of January 15, 2021, this process has already resulted in the BOP releasing at least 139 inmates who were sentenced in the Eastern District of Michigan. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 961 F.3d at 845—the Court should deny Adams' motion for compassionate release.

3

## Background

SMB is a violent narco-street gang from the east side of Detroit from the "Red zone," that has been in existence since 2003. As early as 2007, Jeffery Adams, AKA "Product" or "Brick," was an active member. In the Sixth Superseding Indictment Adams was specifically identified as being involved in at least eight overt acts. In 2007 and 2008, Adams was arrested in the Red zone with drugs and money, and with two other SMB members with drugs, money and a handgun in 2008. For the 2007 incident, Adams pleaded guilty to Attempted Delivery of Cocaine. In 2009, officers in Charleston, West Virginia detained Adams outside of a hotel room. He was found in possession of baggies of crack cocaine and cash. Adams stipulated to distributing at least 150 grams of cocaine base, 338 fluid ounces of Promethazine and Codeine, and 5,000 pills of oxycodone (80mg). From 2012 through 2015, Adams on social media, through Facebook and the "000_big_blood" Instagram page, advertised the sale of various drugs and promoted the ongoing gang war between SMB and other Detroit gangs. He posted photographs of himself and fellow SMB members possessing drugs and firearms and threatening violence to rival gang members. Adams also identified and threatened "snitches." *Presentence Investigation Report [PSR], February 13, 2019, 8-10.*

4

Adams began serving his prison sentence on March 4, 2019, and is currently incarcerated at Allenwood Medium FCI. He is 31 years old, and his projected release date is May 30, 2024. His only underlying medical conditions are a history of childhood asthma and dermatological cysts. Nevertheless, Adams has moved for compassionate release, citing his medical conditions, specifically chronic asthma, and the Covid-19 pandemic. On September 24, 2020, Adams requested compassionate release through BOP for a medical condition, based on his chronic asthma. *Gov't Sealed Ex. D, Inmate Request for Compassionate Release, 2.* Warden Bradley Trate denied Adams' request on October 4, 2020, finding that Adams' medical conditions do not meet the criteria for a debilitated medical condition. *Gov't Sealed Ex. E, Compassionate Release / Reduction in Sentence Denial, 2.* In fact, Adams' medical records do not support a finding of moderate or severe asthma, only that he had asthma as a child. Aside from his non-life threatening dermatological issues, Adams "is healthy and has no serious or chronic illnesses." *PSR, 15.*

## Argument

I.    **The Bureau of Prisons has responded to Covid-19 by protecting inmates, instituting the administration of the vaccine at its facilities, and increasing home confinement.**

   A.    **The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

At the outset of the pandemic, the Bureau of Prisons started modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

6

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. When visitation is permitted at an institution, the visits are non-contact, require masks, and social distancing between inmates and visitors is enforced, either via the use of plexiglass (or similar barriers), or physical distancing (i.e., six feet apart). Visitors are screened for Covid-19 symptoms and their temperature is checked. Visitors who are sick or symptomatic are not allowed to visit, and inmates in quarantine or isolation cannot participate in social visiting. *See* BOP Modified Operations. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month, and legal visits are accommodated upon request. *See* BOP Modified Operations.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

**B.**     **The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Currently, the Bureau of Prisons has 7,880 inmates on home confinement, and the total number of inmates placed in home confinement from March 26, 2020 to the present (including inmates who have completed service of their sentence) is 20,288. BOP Coronavirus FAQs. As the Sixth Circuit stressed, these efforts show that "[t]he

8

system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1) Each inmate's age and vulnerability to Covid-19;
>
> 2) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3) Whether the inmate's release into home confinement would risk public safety.

([03-26-2020 Directive to BOP](#); [04-03-2020 Directive to BOP](#)). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release

or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 961 F.3d at 845, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care

and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, 452 F.Supp.3d 705, 712 (E.D. Mich. 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

### C.   The Bureau of Prisons is receiving the Covid-19 vaccine and is in the process of administrating the vaccine in its facilities.

As of January 15, 2021, the Bureau of Prisons has acquired 16,750 doses of the Covid-19 vaccine and is distributing it to staff and inmates. CDC Covid-19 Vaccine Tracker. The Bureau of Prisons has already initiated the first dose of the vaccine in 16,685 of staff members and inmates. While the precise timing of each inmate's vaccination will depend on many factors, the Bureau of Prisons is working swiftly to vaccinate inmates who consent to receive the vaccine.

**D.      The Court should decline Adams' request for a recommendation that he be granted home confinement.**

The Court should also deny Adams's request for a judicial recommendation to the Bureau of Prisons that he finish his sentence under home confinement. As an initial matter, this Court has no jurisdiction to order home confinement or to review the BOP's decisions on which inmates are, or are not, granted home confinement. *See Miller v. United States*, No. 16-cr-20222, 2020 WL 1814084, at *2 (E.D. Mich. Apr. 9, 2020) ("this Court and others have recognized that the authority to place a prisoner in home confinement is given to the BOP") (collecting cases). But even assuming the Court has the authority to make such a recommendation, Adams is not a strong candidate for it. Adams' adult history is one of multi-state narcotics sales and being involved in the "gang life." He has never been gainfully employed. *PSR, 15.* While in custody, he has had five disciplinary sanctions and is considered at a medium recidivism level.

**II.      The Court should deny Adams' motion for compassionate release.**

Adams' motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has

12

been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). And as the Sixth Circuit has held, this statutory exhaustion requirement is mandatory. *Alam*, 960 F.3d at 832–36.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for release. 18 U.S.C. § 3582(c)(1)(A). The defendant's "generalized fears of contracting Covid-19, without more," do not satisfy this requirement. *United States v. Jackson*, 2020 U.S. App. LEXIS 32269, at *6 (6th Cir. Oct. 13, 2020); *accord United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *2 (6th Cir. May 21, 2020).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020). As at sentencing, those factors require the district court to consider the

13

defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A. Adams has not shown "extraordinary and compelling reasons" for compassionate release.

Even though Adams has exhausted his administrative remedies, compassionate release would be improper.

Resolving the merits of a compassionate-release motion involves a "three-step inquiry": a district court must (1) "find that extraordinary and compelling reasons warrant a sentence reduction," (2) "ensure that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," and (3) "consider all relevant sentencing factors listed in 18 U.S.C. § 3553(a)." *United States v. Elias*, ___ F.3d ___, No. 20-3654, 2021 WL 50169, at *2 (6th Cir. Jan. 6, 2021); 18 U.S.C. § 3582(c)(1)(A). In *Elias*, 2021 WL 50169, at *2, the Sixth Circuit held that USSG § 1B1.13 is not an "applicable" policy statement for defendant-initiated motions for compassionate release. The government disagrees with that holding and preserves for further review its argument that § 1B1.13 remains binding. But, given the Sixth Circuit's holding in *Elias*, controlling circuit precedent now forecloses that argument before this Court.

Even so, Adams has not satisfied the statutory requirement of showing that "extraordinary and compelling reasons" warrant a sentence reduction. That

14

statutory requirement means that a defendant's reasons for release must satisfy two strict criteria. 18 U.S.C. § 3582(c)(1)(A)(i). The defendant's reasons must be "extraordinary"—meaning exceptional or uncommon. *United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020); *United States v. Sapp*, No. 14-CR-20520, 2020 WL 515935, at *3 (E.D. Mich. Jan. 31, 2020). The reasons must also be "compelling"—meaning "so great that irreparable harm or injustice would result if the relief is not granted." *Sapp*, 2020 WL 515935, at *3. A defendant must establish both criteria to satisfy the statute's eligibility threshold. Adams has satisfied neither.

*First*, Adams' reasons for release are not "extraordinary." *Everyone* in our society faces a risk from Covid-19 right now. Over 387,000 Americans have now died from this terrible disease. So as the Sixth Circuit has stressed, "generalized fears of contracting Covid-19, without more," do not justify compassionate release. *United States v. Jackson*, 2020 U.S. App. LEXIS 32269, at *6 (6th Cir. Oct. 13, 2020); *accord United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *2 (6th Cir. May 21, 2020); *United States v. Ramadan*, No. 20-1450, 2020 WL 5758015, at *2 (6th Cir. Sept. 22, 2020). The Bureau of Prisons has also worked diligently to implement precautionary measures reducing the risk from Covid-19 to Adams and other inmates. *See Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to

a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 961 F.3d at 845.

The CDC has identified certain medical conditions that place individuals at increased risk for severe illness from Covid-19. The CDC delineates the conditions into two groups: conditions where individuals who have them "are at increased risk," and conditions that only "might be at an increased risk." CDC.gov (last accessed January 15, 2021). Moderate-to-severe Asthma is in the latter, "might," category. Moderate persistent asthma can be described as "symptoms three to six times a week. Nighttime symptoms three to four times a month. Asthma attacks might affect activities." Webmd.com (last accessed January 15, 2021).

Adams' claim of chronic asthma does not equate to moderate or severe asthma. His 2019 PSR noted that he had childhood asthma but no current chronic health problems. *PSR, 15*. Similarly, his BOP medical records in 2019 and 2020 do not support any diagnosis of moderate to severe asthma. Throughout 2019 and 2020 he has not been prescribed *any* medication for asthma. *Gov't Sealed Ex. F, 2019 BOP Medical Records, 47-48; Gov't Sealed Ex. G, 2020 BOP Medical Records, 38*. Similarly, the BOP records also do not include asthma as a current or resolved health problem. *Gov't Sealed Ex. G, 34-35*.

16

Except for his childhood history of asthma, there was no concern of asthma at all until June 1, 2020, when Adams first complained of breathing problems and claimed that he came to McKean FCI with two inhalers and had received them several times in the past. The medical provider did an "extensive review of [Adams'] records" and found that the review "does not support [Adams'] statements." The medical provider noted that Adams did not appear distressed and that his pulmonary system was within normal limits. *Id., 16.* Adams then sought an evaluation for asthma on July 31, 2020. Adams stated that he had asthma since birth and was hospitalized on a breathing machine as a child. Adams admitted the asthma "slowed up" when he got older. The medical provider examined Adams and found his lungs clear to auscultation with no rhonchi or wheezing. The provider explained to Adams that "he does not have any signs or symptoms of Asthma." *Id., 11-12.* Adams' Covid-19 screens on October 8, 2020 and November 30, 2020 included no shortness of breath. *Id., 5, 10.* Thus, Adams' medical records do not support a finding that he has moderate to severe asthma. *United States v. Smith,* No. 16-20293, 2020 WL 4791226, at *4 (E.Dist Mich. August 18, 2020) (clear pulmonary exam and discontinued asthma medication indicated mild asthma at most).

Therefore, because Adams does not have a chronic condition that the CDC has confirmed will cause him to face an increased risk of severe illness from Covid-19,

his reasons for release are not "extraordinary" and instead present only a "generalized fear[] of contracting Covid-19." *Jackson*, 2020 U.S. App. LEXIS 32269, at *6. The Sixth Circuit has upheld a district court's reliance on the CDC's guidance during the Covid-19 pandemic. *Elias*, 2021 WL 50169, at *4. And the CDC maintains a running list of conditions that are known to place someone at a higher risk of severe illness from Covid-19. *See* CDC Risk Factors (as updated) (identifying the confirmed medical conditions that increase someone's risk from Covid-19). Adams's records establish that he does not have one of those conditions. Because Adams is only *thirty-one* years old, he also does not face the same risk from the disease that the elderly do. The combination of his medical conditions and age, even when considered alongside the Covid-19 pandemic, thus does not rise to the level of an "extraordinary" circumstance. *See also United States v. Bowman,* No. 11-20188, 2020 WL 5891638, at *2 (E.Dist.Mich. October 5, 2020) (medically treated asthma and hypertension does not satisfy extraordinary and compelling reasons).

*Second*, Adams's reasons for release are not "compelling." In the pretrial-release context, the Sixth Circuit has already addressed what qualifies as a "compelling" reason for release based on Covid-19. *United States v. McGowan*, No. 20-1617, 2020 WL 3867515, at *2 (6th Cir. July 8, 2020); *Bothra*, 2020 WL 2611545, at *2. That analysis considers (1) the "original grounds" for the

defendant's incarceration; (2) the "specificity" of his "stated Covid-19 concerns";
(3) the extent to which the proposed release plan would "mitigate or exacerbate"
his risk from Covid-19; and (4) the risk from Covid-19 that his release would pose
to others. *McGowan*, 2020 WL 3867515, at *2. In *Bothra*, for instance, the
defendant was in his 70s and "had health issues rendering him more vulnerable to
contracting [Covid-19]." 2020 WL 2611545, at *2. But he was a flight risk, had
orchestrated a large and complex fraud scheme, and was detained at a facility that
had very few cases of Covid-19. *Id.* The Sixth Circuit thus held that his
circumstances did not present a "compelling" reason for release. *Id.*

Adams' circumstances are even less compelling. The "original grounds" for
Adams' incarceration here were long-term multi-state narcotics distribution and
promoting the escalation of violence in an east side Detroit gang war. *McGowan*,
2020 WL 3867515, at *2. His conviction for that racketeering offense showed that
Adams required a sentence of 120 months in prison. And unlike the pretrial
defendant in *Bothra*, Adams was *convicted* of his offense here—not just accused of
it. So the justice system's "essential" interest in finality weighs far stronger against
Adams's release than it did the defendant's release in *Bothra*. *Teague v. Lane*, 489
U.S. 288, 309 (1989).

**B.**     **The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.**

Even when an inmate has shown "extraordinary and compelling reasons," he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. 18 U.S.C. § 3582(c)(1)(A). A defendant's failure to establish that the § 3553(a) factors support relief is an independent basis for denying compassionate release. *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020); *accord United States v. Austin*, 825 F. App'x 324, 325–27 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors); *United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (same). So even if the Court were to find that Adams established extraordinary and compelling reasons for his release, the § 3553(a) factors should still disqualify him.

For starters, Adams' long remaining sentence weighs heavily against release. This Sixth Circuit has repeatedly upheld the denial of compassionate release under § 3553(a) when a defendant has a long remaining sentence, including in a recent published decision. *Ruffin*, 978 F.3d at 1008; *accord Kincaid*, 802 F. App'x at 188–89; *Austin*, 825 F. App'x at 326; *see also United States v. Kincaid*, 805 F. App'x 394, 395–96 (6th Cir. 2020) ("[W]e don't think [the defendant] raises a close question."). This is because the original sentence already reflects the district court's evaluation of "the need to provide just punishment, the need to reflect the

20

seriousness of the offense, and the need to promote respect for the law" under § 3553(a). *Kincaid*, 802 F. App'x at 188; *accord Ruffin*, 978 F.3d at 1008. Adams has completed 51.5 percent of his full term and is not scheduled for release for another three years at the earliest. *Gov't Sealed Ex. A, 4.*

The plain language of the compassionate-release statute makes the point even more directly: it requires that the defendant's reasons for release "warrant such a reduction" in his sentence. 18 U.S.C. § 3582(c)(1)(A)(i). That inquiry depends, at least in part, on the length of time remaining on the defendant's sentence, requiring him to justify the magnitude of his requested sentence reduction. *Id.* So a defendant with many years left on his sentence, like Adams, must show that his reasons for release are so powerful that they "warrant" a "reduction" of that size. *Id.*

Adams has not shown any effort, in his adult life, to be a positive contributing member of society. He has not been gainfully employed, making money only through the sale of narcotics. Adams has used social media to extol his "gang life" with pictures of guns and drugs. And, as the primary author of the Instagram hit list, Adams identified rival targets and celebrated their violent murders. The § 3553(a) factors—the history and characteristics of the defendant, the nature and seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and protection of the

public—do not support compassionate release. Adams has already received a fair sentence for his crime and should serve the remainder of his sentence.

In addition, Adams's record casts significant doubt on whether he would abide by the release conditions and social-distancing protocols that could diminish his risk of contracting Covid-19 if released from custody. Although the *average* person might have a higher risk of contracting or developing complications from Covid-19 in prison than if released, an *individual* defendant's risk varies widely. It depends on a long list of variables, including the precautions at his prison, the number of Covid-19 cases there, the prison's medical facilities, his access to medical care if released, and the threat from Covid-19 at his release location. A defendant's risk of contracting Covid-19 also depends not just on his opportunities for social-distancing, but on his willingness to take advantage of those opportunities and engage in social-distancing for the pandemic's duration. While in custody, Adams has had disciplinary sanctions for failing to follow safety regulations, being absent from his assignment, and refusing to work. The Court should doubt Adams' willingness to abide by safe behavior.

Releasing only offenders who do not pose a danger to the public or present a significant risk of recidivism is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as

officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen substantial spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. Drug overdoses are skyrocketing. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

**III.    If the Court were to grant Adams' motion, it should stay the release order pending any appeal by the United States.**

If the Court were inclined to grant Adams' motion, despite the government's arguments above, the government would request that the Court's release order include two provisions. First, the Court should order that he be subjected to a 14-day quarantine before release. Second, the Court should stay its order pending any appeal by the government to the Sixth Circuit. More specifically, the government would request that if the government files a notice of appeal before the 14-day quarantine ends, the Court's order would automatically be stayed through the completion of any appeal proceedings.

**Conclusion**

Adams' motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
UNITED STATES ATTORNEY


/s/ *Rajesh Prasad*
Rajesh Prasad
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
Phone:  313-226-0821
E-Mail: Rajesh.Prasad@usdoj.gov

Dated: January 15, 2021

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on <u>January 15, 2021</u>, I electronically filed the foregoing

document with the Clerk of the Court using the ECF system, in addition, a copy will

be mailed to the non-ECF party:

Jeffery Adams
Reg. No. 54466-039
Federal Correctional Institution
Allenwood Medium
Rt. 15, 2 Miles North of Allenwood
White Deer, PA 17810

<div style="margin-left: 50%;">

s/Rajesh Prasad
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan  48226
Phone:  313-226-0821
E-Mail: Rajesh.Prasad@usdoj.gov

</div>